UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

------------------------------------------------------

DAVID R. CUBBY, ESQ.             :

      PLAINTIFF            :

                            :     Civil Action No.

       vs.               :

                            :

CITY OF PATERSON; STATE OF NEW  :
JERSEY; COUNTY OF PASSAIC;      :
COUNTY OF BERGEN; GOVERNOR   :
PHIL MURPHY; NEW JERSEY       :
COMMUNITY DEVELOPMENT      :
CORPORATION; PASSAIC VALLEY   :
WATER COMMISSION; ANDRE       :
SAYEGH; CAMELIA VALDEZ; JERRY  :
SPEZIALE; G&S HUNTERS; ALMA   :
BANK; ALMA REALTY CORP.; FABIAN :
-ALEXANDRIA, LLC; RICHARD     :
BLENDER; ROBERT DEL VECCHIO;  :
JOHN FRESSIE; BASCOM CORP;    :    <u>COMPLAINT</u>
COLUMBIA BANK; TD BANK, NA;   :
LAKELAND BANK; NINA SURICH;   :
JOHN MEOLA; JOHN SEGRETO;    :
DAVID STANZIALE; SOHAIL       :
MOHAMMED; BONNIE MIZDOL;     :
JOSEPH MONAGHAN; LISA FIRKO;  :
KIM CITRINO; HEATHER JOY BAKER; :
JOHANNA BARBA-JONES; RYAN    :
MORIARTY; STEPHEN BUDELMAN;  :
CHARLES CENTINARO; DOMENICK :
STAMPONE; JOHN ABDELHADI; THE :
ART FACTORY, LLC; ONE PATERSON; :
WILLIAM PASCRELL, JR.; WILLIAM  :
PASCRELL, III; PRESSLER &      :
VERNIERO; DISCOVER BANK, NA;  :
RPM DEVELOPMENT           :

            DEFENDANTS.     :

                            :

------------------------------------------------------

## **<u>COMPLAINT FOR VIOLATION OF CIVIL RIGHTS UNDER 42 USC § 1983</u>**

Comes now the plaintiff David R Cubby, Esq. appearing pro se and makes the following complaint

under 42 USC §1983 for the violation of the plaintiff's civil rights to Due Process and Equal Protection

Under the Law secured by the United States Constitution or by Federal law and guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States to deprive the plaintiff of property and due course of justice in violation of 42 U.S.C. sec. 1981, 42 U.S.C. sec. 1985 (3) and 42 U.S.C. sec. 1983.

## I. NATURE OF THE CASE

1.      Plaintiff is the target of a comprehensive scheme of retaliation and harassment designed to infringe upon Plaintiff's personal freedoms under color of law for the purpose of diverting state and federal funds for the unlawful benefit of politically connected persons.

2.      Plaintiff is the subject of multiple false disciplinary actions by the New Jersey Office of Attorney Ethics in which Plaintiff is prevented from defending himself.  There is clear evidence that each action was filed in retaliation against Plaintiff or as an expansion of previous retaliatory campaigns, with none having any merit.

3.      Plaintiff was assaulted and falsely arrested by the Paterson Police Department and issued summonses for multiple criminal offenses, including resisting arrest by force, an indictable offense in the State of New Jersey.  Plaintiff has never been formally charged with any crime, yet is was the target on unlawful warrants issued by Judge John Meola of North Haledon or Judge John Abdelhadi of Paterson.  Both  judges have unlawfully taken steps to conceal their responsibility for the warrant.

4.      The Superior Courts of Bergen County and Passaic County, New Jersey, have refused to provide hearings concerning these allegations even after having been placed on direct notice of severe misconduct.

5.      Additional Lawyers and Judges in other matters before the Office of Attorney Ethics and/or Disciplinary Review Board,  Superior Court, Appellate Division, and New Jersey Supreme Court have conspired to present falsified records of proceedings by filing falsified orders that do not provide

findings of fact or conclusions of law, and refuse to address procedural arguments in a bid to prevent a record suitable for appeal.

6.      The underlying cases involved issues of strong public importance, and Defendants have gone to great lengths to prevent Plaintiff from being heard on them.   As such, the conduct described in the forgoing paragraphs is evidence of a criminal conspiracy actionable through 18 U.S.C. § 1961 Racketeer Influenced and Corrupt Organizations Act.   It can be demonstrated beyond a reasonable doubt that Defendants:

   a.  are engaged in a comprehensive scheme to unlawfully control state and federal grant funding in the State of New Jersey;

   b.  to obscure evidence of past and future attempts at embezzlement of said funds; and/or

   c.  are otherwise engaged in a comprehensive scheme to unlawfully and unethically hide evidence of their incompetence so that they can continue to collect a state salary to perform a function for which they are not qualified.

## II. JURISDICTION AND VENUE

7.      This action arises under Section 1 of the Civil Rights Act of 1871, 17 Stat. 13, 42 U.S.C. § 1983, and the Fourteenth Amendment to the Constitution of the United States.

8.      Venue is proper because the principal defendants, are the State of New Jersey and its subordinate counties and/or employees of the State of New Jersey.

9.      The acts complained of occurred in Passaic County and Bergen County  in the State of New Jersey.

## III. PARTIES

10.    Defendant public entities are named to this action as the sovereign bodies ultimately responsible for the deprivation of Plaintiff's rights and the physical and economic damage to his person.  Defendant Public Entities are as follows:

> a. City of Paterson
>
> b. State of New Jersey
>
> c. County of Passaic
>
> d. County of Bergen
>
> e. Governor Phil Murphy

11.    Defendant individuals and private entities consist of politicians, public officials, financiers, and/or beneficiaries of the unlawful racketeering scheme that targeted Plaintiff's rights.

Defendant individuals are sued in their individual capacities as well as their capacities as public officials and corporate officers and it is directly alleged that they knew or should have known that their conduct was illegal.  Defendant individuals are named as follows: Andre Sayegh; Robert Guarasci; Camelia Valdes; Jerry Speziale; G&S Hunters; Alma Bank; Alma Realty Corporation; Fabian Alexandria, LLC; Richard Blender; Robert Del Vecchio; John Fressie; Bascom Corporation; New Jersey Community Development Corporation;  Passaic Valley Water Commission; Columbia Bank (Fair Lawn, NJ);  TD Bank, NA; Lakeland Bank/Pascack Community Bank; Nina Surich; John Meola; John Segreto; David Stanziale;  Sohail Mohammed; Bonnie Mizdol;  Joseph Monaghan; Lisa Firko; Kim Citrino; Heather Joy Baker;  Johanna Barba-Jones; Ryan Moriarty; Stephen Budelman; Charles Centinaro; Domenick Stampone; Vincenzo Stampone; John Abdelhadi; The Art Factory; One Paterson; William Pascrell Jr.; William Pascrell III; Pressler & Verniero; Discover Bank, NA.

12.     This complaint names specific allegations of misconduct as contained within the four corners of this document, and Plaintiff reserves the right to amend the complaint as additional facts are determined through discovery.

## IV. STATEMENT OF FACTS

13.     Plaintiff has been the target of a racketeering conspiracy aimed to control grant funding in the City of Paterson and County of Passaic, New Jersey.

14.     The racketeering conspiracy referred to in the preceeding paragraph consists of a number of private individuals wilfully and knowingly abusing state and federal law for the purpose of enriching themselves and their family members.

15.     A number of these individuals are elected officials or have been appointed to offices by elected officials.

16.     These individuals have persisted in their unlawful actions in spite of having direct notice that their actions may violate state and federal law.

17.     These individuals have abused the power of their offices to prevent investigations into their misconduct.

18.     These individuals have infiltrated and subjugated both law enforcement and the municipal and county judicial bodies with the intent of circumventing the law and granting favorable rulings to their allies in furtherance of this criminal scheme.

19.     These individuals have succeeded in intimidating voters and nonprofit organizations into supporting their political agendas through the use of force, including but not limited to acts of physical violence and harassment executed by the Paterson Police Department.

20.     These individuals have also conspired against voters and nonprofit organizations who refuse to support their agenda by sabotaging their programs and restricting equal access to funding.

21.      Similarly, these individuals have cooperated to safeguard one another by denying their opponents access to the courts by suppressing the right to hearings and ignorning the New Jersey Rules of Court to punish their opponents through arbitrary rulings, judgments and sanctions.

22.      These individuals have created numerous shell entities, mostly in the form of 501(c)(3) tax exempt organizations, including but not limited to the Defendants named herein, to hide their unlawful conduct.

23.      The shell entities referred to in the preceding paragraphs fail to observe conflict of interest laws and which knowingly fail to execute independent judgment in their operations, and as such operate in knowing violation of the U.S. Tax Code.

24.      The shell entities referred to in the preceding paragraphs knowingly operate as false fronts for politicians and interest groups seeking to exploit tax breaks and embezzle funds intended to revitalize underprivileged communities in order to create no-show jobs for political supporters.

25.      Since at least 2014, Plaintiff has been engaged in advocacy for both historic preservation in the City of Paterson, New Jersey, as well as the use of historic preservation programs and projects for the benefit of Paterson's underprivileged communities.

26.      Defendants represent a wide range of business entities with a vested interest in opposing historic preservation programs and ethical housing policies in favor of high density low income housing projects that earn them higher profits.

27.      Defendants began to target Plaintiff in a comprehensive scheme to both damage Plaintiff's operations in support of this advocacy and to damage Plaintiff personally.

**A. Retaliation for Plaintiff's Advocacy on the Board of the Paterson Free Public Library**

28.     In 2017, Plaintiff was appointed to the Board of Trustees of the Paterson Free Public Library, and was made chair of the Paterson Museum Committee, which is responsible for the Paterson Museum.

29.     Plaintiff was routinely obstructed in attempts to conduct library business in a lawful and open fashion in compliance with New Jersey State Law..

30.     Paterson Library Board trustees regularly ignored and circumvented basic transparency procedures in a bid to circumvent conflict of interest provisions.

31.     Upon information and belief, Paterson Library employees were routinely instructed to falsify records including but not limited to minutes and similar records of public meetings.

32.     Paterson Library Trustees and Paterson Library employees routinely ignored conflicts of interest provision to the benefit of Defendants and Defendants' unlawful racketeering scheme.

33.     Library Board Trustees and employees knowingly circumvented conflict of interest provisions.

34.     Library Board Trustees and employees knowingly engaged in for and non-profit business ventures designed to circumvent anti-corruption laws for the benefit of themselves and family members.

35.     Upon information and belief, these trustees began unlawfully cooperating with Sayegh to circumvent state law while Sayegh was still a Paterson city councilman and committed unlawful acts in support of Sayegh's election to the Mayor's office.

36.     In January 2018, Trustee Derya Taskin unlwafully called an emergency meeting for the purpose of establishing a police substation in the ground floor of the South Paterson library branch.

37.     The South Paterson Library Branch, by state law, is set aside specifically for Library pruposes.

38.    The South Paterson Library Branch is also located just blocks away from a business, Taskin Bakery, that is owned and operated by Taskin and her family.

39.    No valid justification for calling an emergency meeting was ever presented.

40.    Taskin was later appointed to serve as a delegate to the Electoral College for the 2020 U.S. Presidential election.

41.    The Library Board was also informed that the Paterson Police Department intended to use the branch as a basis for a $1 million Community Policing Grant from the New Jersey Department of Community Affairs.

42.    Paterson Police representatives directly and unequivocally stated in the meeting that none of the funds would be used to pay police salaries.

43.    Plaintiff opposed the plan as an unlawful encroachment on the City Council's prerogative, as the matter was never referred to the Council's public safety committee and no representative from the City Council was present at the meeting.

44.    It was later disclosed that certain members of the Paterson Library Board, or the Board's Executive Director, Corey Flemming, allowed the Paterson Police Department to take control of the space without a resolution from the Board in violation of New Jersey State Law.

45.    In the summer of 2018, the alleged South Paterson Library Branch Community Police Station was used to stage campaign rallies for Andre Sayegh, who's political support is based in the 6th Ward, where the branch is located.

46.    In November 2018, it was reported that more than nearly half of the $1 million grant received by the Paterson Police Department was distributed to Paterson Police officers through overtime payments.

47.     It was further reported that some of these officers were collecting vacation pay while they were billing the City of Paterson for this overtime.

48.     Plaintiff demanded documentation from the Paterson Library Board and Director Corey Flemming concerning the Library's approval of the South Paterson branch for use by the Paterson Police Department.

49.     The Library Board refused to provide the documentation.

50.     In November of 2018, Plaintiff attended a Paterson City Council meeting to demand answers for who approved the substation.

51.     The Paterson City Council, attempted to shout down my demands for accountability and stated that if he wanted to, he could just abolish the Paterson Library Board altogether.

52.     No action was taken regarding the unlawful use of the South Paterson Library Branch.

53.     The Paterson City Council has since deleted footage of the November city council meeting from its YouTube page.

54.     Defendant Andre Sayegh thereafter refused to reappoint Plaintiff to the Paterson Library Board in retaliation for Plaintiff's refusal to ignore public corruption.

**B. Retaliatory Eviction**

55.     Plaintiff moved into a one bedroom apartment located at 55 Market Street, Paterson, NJ on or about January 1, 2016.

56.     The building was formerly known as the Alexander Hamilton Hotel, and was operated by Defendant Fabian-Alexandria LLC, a subsidiary of Defendant Alma Realty Group and/or Alma Bank (hereafter "Alma").

57.    In 2014, Plaintiff was named a trustee of the Friends of Hinchliffe Stadium, an organization that, according to its mission statement, was dedicated to the restoration and preservation of Hinchliffe Stadium in Paterson.

58.    The Friends of Hinchliffe Stadium, prior to Plaintiff's involvement, was in reality a loose association of individuals attempting to illegally control donation money and fund raising activities connected with Hinchliffe for their own personal benefit.

59.    Upon information and belief, the Friends of Hinchliffe Stadium has served as a false campaigning front for Defendant Andre Sayegh.

60.    Some time after Plaintiff moved into 55 Church Street, Alma announced plans to build a 10,000 seat indoor arena behind the Center City Mall, a property they lease at no cost from the City of Paterson, and located in the midst of Paterson's historic and unsuitable downtown road network.

61.    Plaintiff had multiple arguments with Ekatarina Valiotis, an officer of Alma Bank and Alma Realty, and a direct familial relative of the controlling owners in Alma Bank.

62.    In August of 2018, Alma unlawfully attempted to increase Plaintiff's rent 10% in retaliation for Plaintiff's advocacy for Hinchliffe Stadium.

63.    Plaintiff discovered that Alma Realty had also unlawfully incrased his rent by 10% in 2017.

64.    At the time of the 2017 rent increase, Plaintiff was unaware that Paterson renters were protected by a Rent Leveling Ordinance that prohibited rent increases in buildings that were not "new construction," as determined by a date set by the ordinance.

65.    The building located at 55 Market Street was completed well in advance of this date and the Paterson Rent Leveling Board confirmed that 55 Church Street had not been granted an exemption from the Rent Leveling Ordinance.

66.    In 2014, Defendant Andre Sayegh, as a councilman, amended the rent leveling ordinance through fraudulent representations to voters that he was "reviving" the board.

67.    Sayegh's amendment in fact made it easier for landlords to raise rents with impunity, as well as defunded the Rent Leveling Board's legal counsel.

68.    The Rent Leveling Ordinance also carved out exemptions for most of the buildings planned or constructed by Defendant New Jersey Community Development Corporation.

69.    It is unknown who or what entity drafted the careful and precise changes to the Rent Leveling Ordinance, which essentially left it powerless behind false public representations from Andre Sayegh that he was restoring it's power.

70.    Plaintiff wrote Alma and demanded a return of all monies Alma had collected unlawfully in rent in multiple letters.  Alma failed to respond.

71.    Plaintiff also requested hearings with the Paterson Rent Leveling Board.  The Rent Leveling Board refused to schedule a hearing.

72.    Plaintiff also wrote Alma rejecting a proposed rent increased Alma attempted to schedule for January 1, 2019.

73.    Having heard nothing from Alma, Plaintiff wrote them again and informed them of his intent to abate rent for the amount Alma had overcharged in rent.  This amounted to Plaintiff abating rent entirely for October, November and December of 2018, and required Plaintiff to make a partial payment in January of 2019.

74.    Alma accepted Plaintiff's partial payment in January of 2019.

75.    Thereafter, Ekaterina Valiotis, in a Facebook argument with Plaintiff concerning Center City Mall and Alma's arena project, threatened Plaintiff with eviction.

76.    Alma thereafter falsely and knowingly filed a complaint for eviction against Plaintiff in Landlord-Tenant Court through Richard Blender, which only has jurisdiction over nonpayment of rent cases.

77.    This was in fact Alma's second attempt to evict Plaintiff unlawfully through Richard Blender. Blender previously filed an evictiom complaint falsely claiming Plaintiff was three months in arrears in rent in 2017.

78.    In reality, Plaintiff was unaware that he had missed a single payment, which was due to Defendant TD Bank having arbitrarily emptied Plaintiff's bank account using fraudulent overdraft fees (as plead below).

79.    In the ensuing 2017 eviction matter, Judge Robert Covello ordered Plaintiff to pay court fees and refused to dismiss the complaint even after it was disclosed Plaintiff was current on all other rent payments, including those for the previous three months.

80.    New Jersey Landlord-Tenant Courts only have jurisdiction over nonpayment of rent cases for possession of the rented premises and Alma did not have a lawful claim for possession of property, and as such Covello did not have jurisdiction to rule on the case.

81.    Plaintiff intended to appeal Covello's decision but was unable to amongst Defendants' attempts to overwhelm him with additional matters.

82.    When Blender once again unlawfully filed for Plaintiff's eviction in 2018, Plaintiff moved orally to transfer the case to the Law Division as it was not a nonpayment of rent matter and as such the Court  once again lacked jurisdiction.

83.    Without jurisdiction to decide the matter, Judge Vicki Citrino refused to transfer the matter and ordered Plaintiff to deposit $6,000.00 with the Court before the Court would here Plaintiff's motion to transfer the matter.

84.    Plaintiff refused to participate in proceedings before a Court lacking jurisdiction and which was clearly hostile to Plaintiff as evidenced by its attempt to place financial barriers before Plaintiff's right to bring defenses and counterclaims for retaliation.

85.    Plaintiff presented evidence to Citrino of Defendants' retaliation which Citrino refused to consider.

86.    Citrino entered a judgment of possession in favor of Alma, and Plaintiff filed an emergent appeal.

87.    The matter was placed before Appellate Judge Lisa Firko, who stayed eviction but otherwise failed to address the trial court's lack of jurisdiction.

88.    Firko ordered Plaintiff to file a motion to transfer the matter to Law Division and upheld the requirement to deposit rents, but further ordered that Plaintiff's motion to transfer would proceed regardless of whether the rent was deposited.

89.    Firko later failed to uphold the Order when Alma obtained orders speeding up Plaintiff's lockout date, and further failed to uphold the Order when Citrino declared Plaintiff's motion moot without a hearing and without findings of facts or conclusions of law.

90.    Plaintiff was eventually evicted without notice by the Passaic County Sheriffs and the Paterson Police Department, who executed the lockout with full knowledge that Alma was still under a stay from Judge Firko.

**C. Plaintiff Assaulted and Battered by the Paterson Police**

91.    Plaintiff requested of the Paterson Police to allow Plaintiff to remove certain personal items from the property.

92.    The Paterson Police refused to allow Plaintiff to remove his two legally owned historic rifles from the apartment.

93.     The Paterson Police falsely informed Plaintiff that they must take the rifles with them, but if Plaintiff appeared at Police Headquarters with his Firearms ID card, they would return them.

94.     Plaintiff accepted these terms based upon the false representations of the Paterson Police.

95.     Plaintiff appeared at the Paterson Police Headquarters that day, and the Paterson Police refused to return Plaintiff's property.

96.     Plaintiff made multiple demands for return of his property, most of which were ignored by the Paterson Police Department.

97.     Plaintiff was falsely told by the Paterson Police that he would have to pay a Federal Firearms Transfer Fee to have his weapons returned.  No legal basis was provided for this demand.

98.     Plaintiff attempted to resolve the matter through Chief of Police Troy Oswald and Police Director Jerry Speziale.

99.     Oswald and Speziale attempted to force Plaintiff to change his mailing address to his mother's residence in Waldwick, NJ in order to have Plaintiff's property returned.

100.    Upon information and belief, Oswald and Speziale were attempting to create public records that Plaintiff did not reside in Paterson or had otherwise legally terminated his residence in Paterson.

101.    Plaintiff also sought assistance from the New Jersey State Police's Firearms Division, specifically a trooper who identified himself as Sergeant Rosario.

102.    Rosario informed Plaintiff that the Paterson Police had a well-known history of unlawfully seizing firearms and refusing to return them, and that the State Police has had to intervene because of their unlawful tactics on several occassions.

103.    In late October of 2019, Plaintiff wrote the Paterson Police demanding return of his property without further delay.

104.    Shortly therafter, the Paterson Police contacted Plaintiff and informed him that he could pick up his property a G&S Hunters on Main Street in Paterson.

105.    On November 2, 2019, Plaintiff proceeded to G&S Hunters to retrieve his property.

106.    Upon arrival, Plaintiff was informed by the presumptive store owner that Plaintiff would have to pay a firearms transfer fee and sign off on a form claiming that Plaintiff had abandoned the weapons at 55 Church Street in order to have his property returned.

107.    Since signing such a form would constitute falsification of a federal firearms transfer form, Plaintiff refused to do so and informed the store owner that Plaintif would report the firearms as stolen if he did not return them to me.

108.    The store owner told Plaintiff that he was going to call the Paterson police and that I had better leave.

109.    Threatened with being accused of leaving the scene of a crime, Plaintiff informed the store owner that he was going to remain and attempted to contact the New Jersey State Police.

110.    Upon information and belief, the store owner contacted a member of the Paterson Police Department on the officer's cell phone for the purpose of avoiding the call being recorded automatically by Paterson's 9-11 call system.

111.    Plaintiff heard portions of the phone converstion between the police officer and the store owner.

112.    The store owner directly informed the police officer of Plaintiff's intent to report the firearms as stolen to the New Jersey State Police

113.    At no time did the store owner describe Plaintiff as an "emotionally disturbed person" or otherwise make any statement to the officer regarding Plaintiff's mental competence.

114.    The Paterson Police failed to take any statements from the store owner concerning his alleged reasons for reporting the matter to police or otherwise intentionally omitted the same from their reports.

15

115.    The State Police, who have sole jurisdiction over firearms law enforcement in New Jersey, refused to come and take Plaintiff's complaint.

116.    The State Police advised me to contact the Passaic County Sheriff's Office instead.

117.    While attempting to contact the Passaic County Sheriff's office, Plaintiff observed Paterson Police Officers outside of the shop and went to the door to let them in.

118.    Approximately thirty officers had arrived within minutes, and the same is asserted as evidence of a pre-planned ambush.

119.    At no time did the officers attempt to ask questions and they immediately assumed combat stances, and Plaintiff observed about thirty officers on the scene, blocking off traffic in both directions.

120.    The Paterson Police Department issued no commands, and only requested that I come out of the doorway to G&S Hunters.

121.    Plaintiff never denied the officer's request and stated that Plaintiff needed a moment so that he could open a recording application due to the aggressive and confrontational conduct of the Paterson Police Department.

122.    Plaintiff never refused the officer's requests to come out of the store, never attempted to block the officers from entering the store, and Plaintiff was never issued any commands or directives, lawful or unlawful.

123.    At that time, the Paterson Police attacked Plaintiff, forcefully removing his cell phone from his hand to prevent the making of a recording.

124.    Plaintiff did not attempt to resist arrest, and was placed into a choke hold by one of the officers while his hands were raised.

125.    The Paterson Police attempted to lift Plaintiff off the ground, and upon information and belief were attempting the carry Plaintiff out of view of the security cameras to continue their attacks.

126.    Plaintiff was ultimately slammed into the sidewalk, and the Paterson Police Department repeatedly shoved his head into the concrete.

127.    Plaintiff was falsely issued summons falsely attesting that Plaintiff resisted arrest by force had committed defiant trespass, and had obstructed an investigation by the Paterson Police Department.

128.    Multiple Paterson officers filed fraudulent police reports in support of the falsely attested summonses that are directly contradicted by video evidence.

**D. Direct Attempts by Passaic County Prosecutor's Office, Paterson Municipal Court, and Passaic County Superior Court to Deny Plaintiff His Due Process Rights.**

129.    The following facts are alleged against all Defendants, but upon information and belief, the following Defendants are most deeply responsible for the following misconduct: John Abdelhadi; Vincenzo Stampone; Domenick Stampone; Nina Surich; John Segreto; John Meola; David Stanziale; Bonnie Mizdol, Sohail Mohammed; Ernest Caposela.

130.    Defendants knowingly, intentionally and unlawfully conspired to deny Plaintiff of his due process rights under the Constitution of the United States of America and the Constitution of the State of New Jersey.

131.    Defendants have failed to charge Plaintiff with any crime resulting from the incidents for which Plaintiff  was illegally attacked, falsely arrested, and falsely issued summonses by the Paterson Police Department.

132.    Defendants knowingly, intentionally and unlawfully conspired to deny Plaintiff an initial appearance in municipal court by unlawfully and without notice to Plaintiff removing Plaintiff's case to Passaic County Superior Court, then back to Paterson Municipal Court, then to Haledon Municipal Court, then to North Haledon Municipal Court, and finally back to Paterson Municipal Court, without filing paperwork and without conducting hearings.

133.    Defendants knowingly, intentionally and unlawfully conspired to deny Plaintiff the right to probable cause hearings for the purpose of forcing Plaintiff to defend false and defamatory charges that would not survived any competent judicial review for probable cause.

134.    Defendant Nina Surich, in her role as a Passaic County Prosecutor, directly lied to Plaintiff about the status and existence of investigations in which Surich stated Plaintiff was the "victim."

135.    Surich knowingly and intentionally misrepresented the existence of these investigations in an unlawful attempt to deny Plaintiff a pre-indictment hearing and to transfer Plaintiff's matter to municipal courts that were friendly to herself and her co-Defendants.

136.    Defendants knowingly, intentionally and unlawfully conspired to deny Plaintiff his right to a grand jury indictment and a jury trial in an unlawful attempt to force Plaintiff into a bench trial adjudicated over by their co-Defendants.

137.    Plaintiff has never been charged with a crime and Defendant prosecutors have refused to certify that there is a legal basis for any charges.

138.    Defendants, while refusing to file charges and refusing to dismiss the summonses, have issued bench warrants against Plaintiff without cause.

139.    Defendants have knowingly and intentionally harassed Plaintiff in issuing the bench warrants which they know are unlawful in the absence of lawfully filed charges.

140.    Defendants are knowing and intentionally using the warrant to bar Plaintiff's freedom of movement and to intimidate Plaintiff through standing threats of unlawful police violence should Plaintiff remain in the State of New Jersey.

141.    Defendants knowingly, intentionally and unlawfully conspired to assist the Paterson Police Department and other Defendants with destroying and/or concealing the destruction of evidence Plaintiff was entitled to through discovery.

142.    Defendants knowingly, intentionally and unlawfully conspired to use the demonstrably false criminal summonses to harass Plaintiff in retaliation for Plaintiff's protected advocacy and to prevent Plaintiff the freedom of motion to further his protected advocacy.

143.    Defendants have attempted to force Plaintiff to appear on the record, only to prevent Plaintiff from speaking, making oral motions, or otherwise to prevent Plaintiff from insisting Defendants follow procedure.

144.    Defendants have used these limited appearances to create a false record of compliance that constitute a fraud upon the Courts and have used them in attempts to intimidate Plaintiff into waiving his rights.

145.    Defendants are knowingly engaging in the above conduct to obstruct investigations into extreme police and judicial misconduct in Passaic County and the State of New Jersey.

146.    Defendants are knowingly engaging in the above conduct to prevent oversight into Passaic County and Paterson municipal government, which they endeavor to control for their personal or professional enrichment.

147.    Defendants are knowingly engaging in the above conduct to prevent investigations into their competence as public officials.

148.    Defendants are knowingly engaging in the above conduct to orchestrate a state and county-wide campaign of retaliation against Plaintiff.

**E. Bergen County's Attempts to Undermine Plaintiff's Civil Rights as Defendant by Initiating a Premature Motion to Revoke Plaintiff's Firearm Purchaser Identification Card.**

149.    On April 30, 2020, Plaintiff was served with a Motion to Revoke his Firearms ID card and to order the sale of my property filed by Assistant Prosecutor Thomas Osadnik in Bergen County.

150.    By this time Plaintiff had been waiting more than five (5) months for an initial appearance.

19

151.    By this time the COVID-19 Pandemic had set in, causing additional delays due to the courts no longer holding in-person sessions.

152.    The Motion stated no legal basis for revoking my Firearms ID Card, and merely stated that since a charge had been filed that Plaintiff was no longer fit to own firearms in the State of New Jersey.

153.    Plaintiff immediately demanded that Osadnik withdraw his motion as it was certain to interfere with my rights as a criminal defendant.

154.    Osadnik admitted to Plaintiff in the course of phone conversations that he had failed to review any of the evidence in my case.  As such, Mr. Osadnik violated state law, New Jersey Rules of Court, and the Code of Professional Conduct in filing his motion.

155.    The Firearms ID Card matter was scheduled for hearings in Bergen County, NJ before Judge Christopher Kazlau.

156.    In light of Mr. Osadnink's premature and fraudulent Motion, Plaintiff requested a case management conference with Judge Kazlau hoping that any chance that Mr. Osadnik's oversights could be explained by simple error or confusion on his part.

157.    Kazlau attempted to shield Osadnik from any responsibility for his premature, frivolous, and fraudulent pleadings.  Kazlau, on several occasions, spoke for Osadnik and argued in his defense.

158.    Kazlau intentionally avoided important issues of procedure and attempted to speak over Plaintiff on several occasions in a blatant and obvious attempt to allow the matter to remain on the docket for the purpose of harassing Plaintiff and forcing Plaintiff to spread his resources over multiple cases.

159.    Plaintiff filed a Motion to Dismiss Mr. Osadnik's frivolous motion, even asking for the Court to grant relief through which Mr. Osadnik would be permitted to revive it once the criminal proceedings had concluded.

160.    Osadnik failed to file an opposition to the motion, and as such admitted that his pleadings were filed without him having reviewed evidence and in violation of his sworn representations in his pleadings that he had.

161.    Kazlau denied the motion out of hand in a hearing in which he routinely attempted to inject false statements of fact.

162.    Kazlau refused to issue a statement of his findings of fact and conclusions of law for which the motion was based and ignored multiple letters from me demanding the same.  This is an open violation of New Jersey State Law, the New Jersey Code of Judicial Conduct, the Rules of Court, and the Rules of Professional Conduct.

163.     Kazlau knowingly and with criminal intent continued to force the Motion forward in spite of being placed on notice of refusals to provide discovery and lengthy and unnecessary denials of Plaintiff's right to an initial appearance in the municipal court proceedings.

164.    Kazlau actively sought to allow Paterson Police Officers to testify in this civil motion which he openly stated he was entitled adjudicate by "relaxing court rules" that would otherwise bar such testimony in criminal court.

165.    It is directly alleged that Kazlau was attempting to assist the Paterson Police Department in rehabilitating the conflicting and/or non-existent testimony in their police reports more than four months after the reports were falsified by the officers.

166.    Such testimony could then be used against Plaintiff in criminal court, leaving Plaintiff to struggle with discovery issues concerning the deleted footage from the surveillance videos that was vital to both his criminal and civil case.

167.    Kazlau was attempted to unlawfully create a record in a parallel proceeding under relaxed rules to cover up his and his co-conspirator's blatant attempts to deny Plaintiff due process. On multiple

occassions Kazalau refused to provide clarifications of orders or scheduled proceedings in violation of my right to fair notice of proceedings.

168.    Sometime following the filing of Osadnik's motion, an unknown Bergen County Detective appeared at Plaintiff's residence in Waldwick, NJ and dropped off a compact disc containing limited discovery on my case.

169.    No cover letters, certifications of completeness, or similar documentation was included with the disc.

170.    The disc contained heavily edited surveillance footage of my attack and failed to include all available footage.

171.    Six seconds of footage were deliberately deleted from the videos that would have shown the moment I was unlawfully assaulted by the Paterson officers.

172.    This footage would clearly show that Plaintiff was attempting to open a recording application on his smart phone and that Plaintiff was grabbed violently and unexpectedly by the offending officers.

173.    All footage from outside the store showing the arrival of the Paterson Police Department was withheld.

174.    Osadnik and his co-conspirators attempted to avoid accountability for spoliation of evidence and further attempted to avoid holding the Paterson Police Department, Passaic County, and Bergen County Prosectuor's Offices from being held accountable for falsified evidence and official corruption.

175.    Judge Kazlau was made expressly aware of these issues concerning spoliation and withholding of evidence yet refused to address multiple letters describing this blatant misconduct.

176.    Kazlau refused to acknowledge the spoliation issues on the record and attempted to schedule dispositive hearings with full knowledge that I was being denied evidence and that official misconduct had been committed entirely New Jersey State employees and officials.

**F. Retaliation Against Plaintiff's Law Practice**

177.    The following facts are plead for the purpose of demonstrating retaliation against Plaintiff. Plaintiff acknowledges that this action cannot alter the outcomes of these cases, regardless of how corrupt and egregious Defendants' conduct.

178.    Regardless, the facts plead herein are valid evidence of a civil and criminal conspiracy to undermine Plaintiff and his law practice through deliberate unlawful conduct.

179.    Defendants are accused of abusing their offices for personal and/or political gain, and further abusing them to give these unlawful acts the color of law

180.    Defendants directly conspired against Plaintiff by arranging hearings and return dates that they could manipilate to their advantage

181.    Defendants directly conspired against Plaintiff by arranging hearing and return dates that they knew would place Paintiff at a disadvantage in litigation.

182.    Defendants directly conspired to create scheduling conflicts for Plaintiff through the filing of false and defamatory criminal charges as well as false and defamatory ethical charges with the purpose of preventing Plaintiff from adequately representing himself and his clients.

183.    Defendants were regularly warned by Plaintiff that their conduct violated state and federal law.

184.    Defendants routinely ignored correspondence and pleadings filed by Plaintiff requesting clarifications of holdings or reasons for refusing to provide reasonable scheduling accomodations.

185.    Defendants ignored allegations of fraud and misconduct and conspired to prevent themselves and their co-Defendants from having to answer for their misconduct on Court record.

186.    Defendant judges conspired with Defendant attorneys to prevent Defendant attorneys and their clients from having to allegations of fraud and misconduct.

187.    Defendants knowingly and for the purpose of falsifying court records refused to resolve issues of procedure on the record, and intentionally left their orders and instructions vague and confusing over Plaintiff's objections.

188.    Defendants directly conspired to unlawfully manipulate court records to feign compliance with Court Rules and New Jersey state law in a knowing attempt to avoid prosecution for their unlawful acts.

## F. Specific Cases in Which Plaintiff's Law Practice and Clients were Unlawfully Targeted for Retaliation

189.    The Passaic County Courts, including but not limited to Judges Ernest Caposela, Thomas LaConte, Thomas Brogan, Vicki Citrino, Bruno Mongiardo, Robert Covello, and Sohail Mohammed, are willing participants in a scheme to set aside the law for the benefit of their allies, political agendas, and/or personal enrichment.

190.    The Bergen County Courts, including but not limited to retired Judge Bonnie Mizdol, Judges Christopher Kazlau and Joseph Monaghan, are willing participants in a scheme to set aside the law for the benefit of their allies, political agendas and/or personal enrichment.

191.    Ernest Caposela, Passaic County Assignment Judge, was previously assigned to Bergen County and has working if not personal relationships in both courthouses.

192.    As previously noted, the following facts are plead for the purpose of demonstrating retaliation against Plaintiff.  Plaintiff acknowledges that this action cannot alter the outcomes of these cases, regardless of how corrupt and egregious Defendants' conduct.

## 1. Bascom Corporation v. Paterson Coalition for Housing.

193.    This matter involved tax lien fraud perpetrated by the City of Paterson for the purpose of unlawfully granting property in the City of Paterson to politically connected parties through unlawful tax foreclosures.

24

194.    The plaintiff in that matter and Defendant in this matter, Bascom Corporation, upon information and belief, is a fictitious corporation created for the purpose of disguising the false and fraudulent nature of the unerlying tax foreclosure transactions.

195.    Bascoms's registered address in all court documents is in fact a procurement center on River Road in Paterson operated by Defendant Passaic County.

196.    Upon information and belief, between 2000 and the present date, thousands of illegal tax lien certificates were issued to Defendant Bascom Corporation and/or Defendant John Fressie, identified as an officer of Bascom Corporation in numerous filings.

197.    The instant subject matter of this case involved a historic factory builidng located on Spruce Street in Paterson, NJ in the heart of the Paterson Great Falls Historic District.

198.    The specific property was and is lawfully owned by Paterson Coalition for Housing (hereafter "PCH"), who was using the property as a furniture bank in support of their low income housing operations.

199.    PCH applied for and was granted tax exempt status for the subject property.  The City of Paterson ignored that status and began issuing tax liens against the property with full knowledge they were invalid.

200.    PCH spent years fighting multiple attempts to sell additional liens against the property and at least two foreclosure attempts.

201.    The subject property is a priceless historic brownstone building, which is in line or has already received millions of dollars in grant funding for historic preservation.

202.    In or about 2014, PCH was engaged in litigation with Tower Lien Services, who were attempting to foreclose on the property.

203.    The trial court in that matter stayed proceedings on the trial level so that PCH could proceed with a tax appeal.

204.    While that appeal was pending, Bascom Corporation conspired with the City of Paterson to fabricate tax lien certificates that were never lawfully sold at public auction through unlawful arrangements with the City.

205.    Dozens of tax liens were sold to Defendant Bascom Corporation and/or Defendant John Fressie, the purported president of Bascom Corporation.

206.    Many of these liens provide conflicting information and contain facial evidence of fraud.

207.    Bascom Corporation, with full knowledge of the other case, filed a second foreclosure action based upon one such tax liencertificate, omitting the existence of the other case from their pleaded facts in knowing violation of New Jersey Court Rules and state and federal law.

208.    Bascom Corporation never served PCH with a copy of the complaint in their foreclosure action and manufactured false evidence of service upon PCH.

209.    PCH was forced to file motions to be heard in the foreclosure proceedings, which were before Defendant Thomas LaConte.

210.    LaConte conspired with Bascom's counsel to ignore the dual track litigation that was proceeding and without any evidence of the lawful purchase of the alleged tax lien certificates, rubber stamped Bascom through the foreclosure process.

211.    Bascom had full knowledge of the proceedings in the prior matter, and without notifying PCH or the Courts, acquired Tower Lien's interest in the subject property.

212.    Bascom never informed the court or PCH of their acquisition of Tower's interest.

213.    Ultimately, the Tax Court ruled that it did not have jurisdiction to grant PCH relief, but directly stated in its opinion that PCH had the right to return to the trial court to challenge the validity of the underlying certificates.

214.    Bascom later falsely represented that the Tax Court had rejected PCH's claims, allowing a foreclosure to proceed, which was entirely false and a fraud on the trial court.

215.    Judge LaConte entered orders for final judgment against the property without required proofs and knew or should have known that Bascom had violated Court Rules and state law.

216.    Plaintiff first wrote Judge LaConte, demanding a review of his orders of final judgment in consideration of his egregious errors of process and the denial of PCH's right to be heard in court.

217.    Judge LaConte advised Plaintiff that if they thought something was wrong, they should "just file a motion."

218.    Plaintiff filed a motion to vacate sheriff's sale and final judgment.

219.    Thereafter, Plaintiff was informed by Court staff that Judge LaConte had retired and the new presiding Judge of General Equity, Randall Chiocca, was dealing with a back log due to this retirement.

220.    This was in fact entirely false; LaConte was recalled to the bench almost immediately and upon information and belief has been serving in the same capacity as judge the entire time.

221.    It is directly alleged that the State of New Jersey, and more specifically Passaic and Bergen Counties, routinely recalls judges to avoid mandatory retirement ages and as a method of shifting cases to judges without creating a record of recusal or to otherwise dissipate responsibility and/or to give the resulting decisions a  false color of neutrality.

222.    It is directly alleged that the retirement was falsely engineered to prevent LaConte from having to answer for his misconduct on the record.

223.    It is directly alleged that LaConte and Chiocca conspired with the City of Paterson and Bascom Corporation to devise a strategy to defeat PCH's motion without having to answer PCH's allegations of public fraud.

224.    As part of this strategy, PCH was denied a hearing for at least six months while Defendants drafted multiple motions that could be dumped on PCH and plaintiff just prior to the scheduled hearings without sufficient time for PCH and Plaintiff to respond.

225.    The property was purchased shortly after the fraudulent foreclosure was finalized, by Defendant New Jersey Community Asset Preservation Corporation ("NJCAPC").

226.    NJCAPC was fully aware of the ongoing litigation prior to their purchase of any interest in the property and had met with and made offers to PCH for the purchase of the property.

227.    NJCAPC's purchase was intended to place a "bona fide purchaser" between PCH and Bascom Corporation, when in realigy NJCAPC knew the property was a massively distressed risk.

228.    NJCAPC had notice that the property was distressed.

229.    Plaintiff had placed lis pendens on the property during the pendency of the motion; Defendant TD Bank, with notice of the lis pendens, made multi-million dollar loans against the property with full knowledge of PCH's pending lawsuits.

230.    Chiocca permitted NJCAPC to intervene in the matter more than six months after PCH's motion was filed, and in hearings that were scheduled for PCH's motion to vacate.

231.    Chiocca ignored PCH's request for separate hearings and intentionally scheduled them together to create chaos for Plaintiff and PCH.

232.    After granting NJCAPC's motion to intervene, Chiocca forced an adjournment of the hearing to allow the City of Paterson to produce proofs that the tax lien certificates had been lawfully sold.

233.    The City of Paterson never produced the proofs.

234.    While the matter was pending a second hearing, NJCAPC, over PCH's objections, were permitted to file briefs opposing PCH's motion.

235.    When the hearing reconvened, Chiocca denied PCH's motion under the doctrine of laches and refused to issue findings of facts or conclusions of law on PCH's allegations of fraud.

236.    It is directly alleged that Chiocca knowingly granted the adjournment to give NJCAPC an opportunity to file a brief that Chiocca could then falsely use to deny PCH's motion under color of law.

237.    Chiocca refused to address the City of Paterson's failure to produce proofs that the liens were validly sold, direct evidence of his willingness to ignore the more pertinent legal issues in order to deny the motion for the benefit of his co-Defendants.

238.    Chiocca was disinterested in PCH's arguments at the second hearing and hurried towards reading a prepared statement into the record as his decision.

239.    No paper or electronic copy of the decision was ever produced.

240.    Chiocca refused to answer Plaintiff's questions regarding Chiocca's blatant reading of false statements of fact into the record.

241.    Chiocca attempted to intimidate Plaintiff when Plaintiff objected to Chiocca's open falsificiation of the record.

242.    A Passaic County Sheriff present immediately sought to intimidate Plaintiff when he rose to object to Chiocca's falsification of the record.

243.    Plaintiff directly accused Chiocca of corruption in court on the record as a result of Chiocca's clear and intentional refusals to decide the case on the merits.

**2. Passaic County Judges Retaliated Against Plaintiff through the New Jersey Office of Attorney Ethics**

244.    The timing of hearings in Bascom Corporation were intentionally scheduled to conflict with hearings in Plaintiff's personal eviction proceedings as well as eviction complaints plaintiff was

handling pro bono on behalf of tenants who were being wrongfully evicted in retaliation by other politically connected landlords, including but not limited to George McCloof and Longstreet Development, LLCP

245.    The decision in Bascom was entered several days before Plaintiff was evicted from his own apartment.

246.    Plaintiff had written Assignment Judge Ernest Caposela in Passaic County on several occassions to inform him of egregious misconduct by his subordinates.

247.    Caposela failed to take any action.

248.    The decision in Bascom Corporation and Plaintiff's allegations of corruption against Judge Chiocca occurred several days prior to Plaintiff's unlawful eviction.

249.    At some point between the Bascom Decision and Plaintiff's eviction, Plaintiff wrote Caposela to inform him of an egregious abuse of process committed by Judge Thomas Brogan on behalf of George McCloof and Longstreet Development, which Caposela ignored.

250.    Caposela was aware of  Plaintiffs allegations against Chiocca when, following Plaintiff's unlawful eviction, Caposela requested that Richard Blender write a letter to Caposela accusing Plaintiff of misconduct.

251.    Upon information and belief, Caposela forwarded this letter to the Office of Attorney Ethics, without substantiating any reason Caposela thought it was appropriate for discipline and without naming any grounds for discipline at all.

252.    Blender's letter contained multiple falsehoods and was based entirely on hearsay. Blender falsely accused me of threatening him during landlord-tenant mediations, when it was in fact Blender who called me a "deadbeat" when I informed the mediator that Blender had unlawfully filed his Complaint in a court that didn't have jurisdiction.

253.    The Office of Attorney Ethics, specifically Ryan Moriarty and Stephen Budelman, thereafter proceeded to harass Plaintiff over having called Blender a "scumbag" during mediation.

254.    Plaintiff unequivocally states that while the term may not have been as eloquent as some would prefer, "scumbag" is nonetheless a colloquially accurate description of Richard Blender as evidenced by Blender's conduct and as such is a statement of fact.

255.    Nonetheless, the OAE entirely ignored the fact that Plaintiff was not even acting in his capacity as an attorney, but as a pro se litigant.

256.    Moriarty and Budelman served Plaintiff with threatening letters demanding his appearance in Ewing, NJ for investigatory interviews into disciplinary charges against Plaintiff.

257.    Ewing is approximately a one and a half hour drive from Plaintiff's residence in northern New Jersey.

258.    Budelman at one point contacted Plaintiff by phone, while Plaintiff was attempting to obtain an emergency stay of eviction.

259.    Budelman was directly informed that Plaintiff could not speak with Budelman at the time due to Plaintiff having to file an emergent motion, and Plaintiff agreed to call him back as soon as was practical.

260.    Budelman, who gave no indication of such over the phone, responded by writing a letter to Plaintiff falsely accusing Plaintiff of noncompliance with the OAE.

261.    It is directly alleged that Budelman was directly attempting to manufacture evidence of noncompliance.

262.    Plaintiff responded demanding Budelman withdraw his letter as it was entirely false. Budelman refused to do so.

263.    Plaintiff further demanded a clear and concise statement of the alleged ethical violations. Budelman and Moriarty refused to provide it.

264.    Plaintiff forwarded copies of letters containing allegations against the Passaic County judges.

265.    Upon information and belief, no judges or opposing counsel were forced to appear in Ewing before the OAE.

266.    During the course of the interview, Ryan Moriarty was combative, accusational, and was clearly attempting to manufacture red herrings of noncompliance around Plaintiff.

267.    Moriarty and Budelman refused to produce documentation containing the allegations of misconduct, other than Blender's letter.

268.    To date Plaintiff has never been provided with a statement of the alleged unethical conduct as required by OAE and Court Rules.

269.    During the interview, Moriarty admitted that he was aware of Plaintiff's allegations against Chiocca, yet had refused to include reference to them in his letters and filings.

270.    It is directly alleged that Moriarty failed to reference the Chiocca allegations in his letters because Moriarty knew it could be used as evidence of retaliation.

271.    In the event that Moriarty claims he did not know it could be used as evidence of retaliation, it is submitted as evidence of Moriarty's incompetence and/or lack of moral fitness to be an attorney.

272.    Plaintiff did not hear anything from the OAE for several months after the interview.

273.    The OAE did not file a formal disciplinary complaint against Plaintiff until after he was attacked by the Paterson Police in November of 2019.

274.    The disciplinary complaint directly referred to the proceedings before Chiocca and falsely accused Plaintiff of attempting to disrupt a tribunal, allegations which had been omitted from Moriarty's false and misleading letters referred to in paragraphs 267 and 268.

275.    Thereafter, nearly every OAE proceeding or filing was scheduled or made to conflict with proceedings in Plaintiff's criminal mattter and the unlawful parallel civil motion to unlawfully deprive Plaintiff of his New Jersey Firearms Purchaser Identification Card, as plead below.

276.    Plaintiff filed an answer with the OAE, which Ryan Moriarty prevented from being officially filed for some number of momths.

277.    It is direcly alleged that Moriarty obstructed the filing of Plaintiff's Answer in coordination with and in attempts to create scheduling conflicts with Plaintiff's other obligations to himself and his clients.

278.    Plaintiff's answer consisted of admissions and denials in the standard form, and several affirmative defenses including but not limited to the OAE's failure to state a claim, and Plaintiff's right to due process and free speech.

279.    Later, hearings were scheduled before retired Judge Alexander Carver in which Moriarty argued to have Plaintiff's answer struck on the grounds that Plaintiff "did not provide all factual information."

280.    Moriarty has never produced any statement of the information he contends is missing, or why he could not proceed with a hearing after Plaintiff admitted to what Moriarty was falsely alleging as misconduct.

281.    Moriarty conspired with Judge Carver to engineer sham hearings to create the appearance that Plaintiff had been given an opportunity to be heard.

282.    It is unknown whether Carver was disinterested in doing the job for which, upon information and belief, he was paid a stipend or a regular salary, or if Carver is a co-Conspirator of Defendants.

283.    Carver initially rejected Moriarty's arguments, and granted an adjournment over Plaintiff's objections to provide additional briefing.

284.    Moriarty's additional briefing contained the same arguments he had already offered, but in the following hearing Carver nonetheless facetiously reversed course and struck Plaintiff's Answer.

285.    Thereafter, Carver permitted Moriarty to draft a formal motion and file it after Moriarty was given the advantage of hearing Plaintiff's counterpoints and defenses.

286.    Carver granted the motion, obfuscating the fact that he had already decided to strike Plaintiff's pleadings without justification or proofs.

287.    Plaintiff demanded hearings from the Disciplinary Review Board and the New Jersey Supreme Court, which were ignored.

288.    The Disciplinary Review Board falsely represented to Plaintiff that his only remedy would be to admit the first answer was deficient, which it was not, and to request permission to refile his answer.

289.    Plaintiff rejected the DRB's false representations and further demanded hearings that Plaintiff was entitled to by Court Rule.

290.    Plaintiff has demanded and Moriarty and the OAE have refused to provide transcripts of interviews with Plaintiff's alleged accusers.

291.    Upon information and belief, Moriarty and the OAE never interviewed these witnesses and initiated disciplinary proceedings against Plaintiff without evidence in a clear bid at retaliation.

292.    Moriarty and Budelman have been directly accused of incompetence and complicity in the civil conspiracy in direct terms in correspondence from Plaintiff.

293.    Moriarty has refused to recuse himself from the matter, and has opened as many as a half dozen additional disciplinary matters against Plaintiff.

294.    None of the matters opened by Moriarty have any merit, and as such the matters are clear evidence of Moriarty's willingness to harass Plaintiff and prevent investigation into Moriarty's conduct.

295.    The OAE, DRB and the Clerk of the Supreme Court of New Jersey continue to produce false and defamatory documents purported to be validly entered orders, in spite of the fact that Plaintiff has never been granted a hearing.  None of the orders bear the signature of a judge or anyone empowered to impose discipline.

296.    These orders, without transcripts, findings of facts, or conclusions of law, were then filed with the U.S. District Court for the District of  New Jersey, and as such constitute a fraud upon this Court.

**3. Lisa Firko Fails to Recuse Herself on Appeal of Bascom Corporation v. Paterson Coalition for Housing.**

297.    PCH appealed the ruling in Bascom Corporation v. Paterson Coalition for Housing, citing Chiocca's failure to address any of Bascom's misrepresentations and multiple frauds upon the Court.

298.    Plaintiff was targeted by Appellate Division staff, who applied a doctrine of severe legal formalism to delay hearings for several months.

299.    Briefs for Bascom/NJCAPC failed to address any of the issues of tax lien fraud, attorney misconduct, and judicial misconduct argued in PCH's appellate brief.

300.    The matter was originally scheduled before different judges, but ultimately went before a panel including Judge Lisa Firko, whom Plaintiff had previously accused of corruption and/or incompetence.

301.    As noted above, Firko filed an ethical complaint against Plaintiff in retaliation.

302.    Plaintiff demanded Firko recuse herself from the case, and Firko failed to do so in spite of a clear conflict of interest.

303.    Firko ignored Plaintiff's briefed issues, including the misconduct of Judge Chiocca and the misrepresentations made by Robert Del Vecchio and Bascom Corporation while filing and prosecuting the foreclosure.  Firko instead used her opinion to attack Plaintiff personally.

304.    Upon information and belief, Firko knew or should have known that her holding was entirely legally deficient and her participation in the case unlawful, and solely intended to create headlines that could be used to attack Plaintiff's credibility with a color of truth.

305.    Defendant Charles Toutant of the New Jersey Law Journal was directly informed of Firko's misconduct and failure to recuse herself.

306.    Toutant nonetheless wrote an article ignoring the clear instances of corruption in that and Plaintiff;s other cases.

307.    Toutant intentionally defamed Plaintiff by writing as if Firko's statements were fact, and failed to conduct thorough interviews with Plaintiff or otherwise impartially report Firko's actions.

308.    Toutant has written subsequent articles falsely and maliciously portraying Plaintiff as a "rude attorney" without factual basis and for the purpose of creating a false record of Plaintiff's alleged rudeness and/or noncompliance, and for the purpose of creating a false narrative that Plaintiff engaged in misconduct.

**Refusal by Governor Phil Murphy, the Office of Attorney General, the Department of Criminal Justice, and the County Prosecutor's Office to Conduct an Impartial Investigation.**

309.    While a decision in Bascom Corporation v. Paterson Coalition for Housing was pending, New Jersey Governor Phil Murphy released a statement highlighting the usefulness of historic preservation in revitalizing downtown areas.

310.    Murphy specifically referenced the PCH property at 12 Spruce Street as a prime target for historic preservation grants.

311.    Plaintiff contacted Governor Murphy's chief of staff and directly alerted him to the unlawful foreclosure and sale of the property.  No response from Murphy was received.

312.    Following Plaintiff being attacked by the Paterson Police Department, Plaintiff filed internal affairs complaints with the Paterson Police Department that have been completely ignored.

313.    The Passaic County Prosecutor's Office never interviewed Plaintiff to conduct an investigation and issued a form letter with no findings of facts and conclusions of law, stating that their investigation uncovered no misconduct.

314.    The Department of Criminal Justice has never interviewed Plaintiff, and fails to return phone calls.

315.    The Department of Criminal Justice screened Plaintiff's phone calls, forcing Plaintiff to contact the DCJ on alternate phone lines after multiple calls were ignored.

316.    Plaintiff contacted the New Jersey Office of the Attorney General ("NJOAG") in 2019, then under Attorney General Gurbir Grewahl, on multiple occasions demanding an investigation and a takeover of the Paterson Police Department.

317.    Most recently, in the wake of the murder of Najee Seabrooks, The NJOAG assumed control of day to day operation of the Paterson Police Department.

318.    Plaintiff made multiple attempts ot contact the NJOAG and its subordinate New Jersey Department of Criminal Justice ("NJDCJ") for the purpose of giving statements to investigators handling the hundreds of complaints for misconduct filed against the Paterson Police Department.

319.    At the time of this writing, more than a month and a half removed from Plaintiff's attempt to get in contact with the Attorney General's office, Plaintiff has not had a single call returned by either office.

320.    The NJOAG has claimed that the matter was referred to the NJDCJ, but at time of writing the OAG has refused to produce any document or writing through which this referral was allegedly made.

321.    Further, the NJOAG falsely represented that a phone number given to Plaintiff to contact the NJDCJ was in fact a main phone line to their offices, when in fact it was the phone number for their records division, with no connection to investigations.

322.     NJOAG staff Jeffrey Lenox and an associate identified as "John" have screened Plaintiff's calls and have refused to provide basic information, including but not limited to the names and contact information for the people to whom Plaintiff's matter has allegedly been referred.

323.     Attorney General Matthew Platkin has, without conducting an investigation, elected to retain Paterson Police Department internal affairs officers while ignoring Plaintiff's evidence of their corrupt actions.

324.     Upon information, belief and evidence,. Platkin and Murphy are using their respective offices to avoid politcal accountability for their failure to protect New Jersey taxpayers from the Paterson Police Department.

**G. Selective Enforcement and Unlawful Protection of The Art Factory, LLC**

325.     The Art Factory, LLC is a wedding venue that was originally promoted and approved as artist gallery and studio space.

326.     The Art Factory is notorious in Paterson as a politically favored operation that has been allowed to operate without approvals or permits due to its close relationships with Paterson Mayor Andre Sayegh and Congressmen Bill Pacrell, both of whom regularly host fundraisers on the property while the property lacked proper licenses to be open to the public.

327.     The Art Factory has attempted to use its favored status to bully Paterson artists and monopolize arts funding, programming, and sales.

328.     The Art Factory has been assisted in these unlawful acts by their co-Defendants.

329.     In 2018, Plaintiff organized an arts event in conjunction with the Paterson Museum, which the Art Factory directly interfered with.

330.    After Plaintiff issued press releases and organized meetings with local artists, the Art Factory, supported by New Jersey Community Development Corporation, attempted to schedule a competing event for the same weekend.

331.    Art Factory officials also attended Plaintiff's meetings and threatened to sue Plaintiff and his co-organizers if they held their own art event, claiming that the events were their intellectual property, a position for which there is absolutely no legal basis.

332.    NJCDC and the Art Factory initially invited Plaintiff to a meeting to collaborate on the event, and the result of the meeting was otherwise that both events would proceed, and would hold their events in a spirit of cooperation.

333.    In a private meeting between Plaintiff and Art Favtory Owner David Garsia following the meeting concerning the arts event, David Garsia threatened Plaintiff with destruction if Plaintiff moved forward with his event plans.

334.    Following the meeting, NJCDC and Art Factory employees had Plaintiff removed from group e-mails concerning pallning of the arts event.

335.    Sometime thereafter, NJCDC and the Art Factory canceled their event without notice to Plaintiff or his co-organizers.

336.    On the day of Plaintiff's event, NJCDC CEO Robert Guarasci contacted artists participating in Plaintiff's event and told them Plaintiff's event was also canceled, which was entirely false.

337.    Guarasci stated that the event was canceled because "Andre Sayegh did not want the event to occur until he was mayor."

338.    The Art Factory Property is located next to the property owned by Plaintiff's client, Paterson Coalition for Housing, on Spruce Street in Paterson.

339.    The Art Factory has a long history of hostility against PCH, including refusals to repair damage to PCH's building when trucks delivering to the Art Factory backed into a wall on PCH's property.

340.    The Art Factory also refused use of their property to PCH that PCH needed to repair damage to the roof on PCH's historic building.

341.    Failure to preserve the building was later cited by Defendant CAPC and Judge Chiocca as a false and fraudulent basis for allowing CAPC to retain title to PCH's building.

342.    NJCDC also attempted to negotiate a sale of PCH's building before it has been foreclosed upon, and Paterson City documents instructed potential buyers to contact Robert Guarasci and NJCDC while PCH still held title to the building.

**H. Interference with and Exploitation of Plaintiff's Hinchliffe Stadium Advocacy**

343.    Plaintiff further alleges that Defendants' unlawful actions were further designed to remove Plaintiff from discussions over the restoration of Hinchliffe Stadium.

344.    The restoration of Hinchliffe Stadium has become a $130 million fraud upon the taxpayers of the State of New Jersey.

345.    Defendants knowingly and deliberately attacked Plaintiff's credibility, professional reputation, personal freedom and financial interests to justify granting contracts to Montclair, NJ based organizations and shell companies that would kick money back to them.

346.    Defendants, Andre Sayegh in particular, have falsely and fraudulently misled Paterson voters to unlawfully fund the construction of low income and senior citizen housing that will be owned by their political allies, friends and family members.

347.    The City of Paterson is seeing no benefit from these construction projects and Sayegh has refused to release information on the beneficiary interest of the rent monies that they will collect in the form of federal housing vouchers.

348.    Defendants are retaliating against Plaintiff for Plaintiff having exposed the fact that these housing projects are unnecessary and an unlawful fraud upon New Jersey taxpayers.

349.    Defendants retaliated against Plaintiff for Plaintiff having repeatedly blocked their attempts to exploit Hinchliffe Stadium and the adjoining property known as the Vistas to further private real estate development deals that deprive Paterson of tax revenue.

**I. Arbitrary and Capricious Rulings Targeting Plaintiff's Personal and Business Bank Accounts**

350.    Defendants succeeded in using their influence in the Passaic County and Paterson Municipal Courts to lock Plaintiff into a situation where Plaintiff could not clear cases from his workload due to the Defendants' refusal to follow procedure.

351.    Plaintiff's income streams were greatly effected by his being forced to continuously file Motions to Reconsider that should have been unnecessary given the clear weight of evidence and law being clearly in his clients' favor.

352.    Plaintiff was also forced to file Motions to Reconsider due to the Courts' repeated failure to provide findings of fact and conclusions of law as required by Court Rules and New Jersey law.

353.    Furthermore, Defendants' routinely refused to issue complete holdings, making it impossible for Plaintiff to file appeals without first filing motions to force Defendants to perfect the record for appeal.

354.    It is alleged that this was done intentionally to drain Plaintiff's resources, overextend his practice and eventually collapse his client's cases.

355.    Plaintiff began driving for the rideshare application Uber in order to supplement his income, which allowed flexibility of schedule but nonetheless consumed more of Plaintiff's time.

356.    Sometime thereafter, Defendant TD Bank arbitrarily removed over $450.00 from Plaintiff's bank account in overdraft fees and refused to return them.

357.    Plaintifff's account never went into a negative balance during this period.

358.    TD's unlawful seizure of Plaintiff's funds left Plaintiff with less than $10.00 in his bank account, representing all of Plaintiff's available funds.

359.    Plaintiff's bank account bore a positive balance even after the overdraft fees were removed.

360.    Defendant TD Bank justified the fees by claiming an item that cleared the Monday the funds were removed actually cleared the previous week, which is false.

361.    Between 5:00 PM on Friday of the week preceding the removal of the funds and 9:00 AM on the Monday the funds were removed, Plaintiff made numerous deposits for the express purpose of covering all transactions Plaintiff was planning to make that weekend.

362.    TD Bank arbitrarily decided to not honor those credits to the account on the date they were made, and gave them a credit date for that Monday.

363.    Simultaneously, TD Bank arbitrarily decided to debit Plaintiff's account that Monday and back date the transactions to the previous Tuesday.

364.    Regardless of when the credits and debits were posted, Plaintiff's account bore a positive balance at all times Plaintiff processed his transactions over the course of the weekend.

365.    Plaintiff's account still bore a positive balance even after TD Bank unlawfully removed virtually all of Plaintiff's funds.

366.    TD Bank's illegal seizure of Plaintiff's funds resulted in Plaintiff having extreme difficulty making rent and credit card payments on time.

367.    In previous instances, TD Bank had willingly reversed unjustified overdraft fees without question, but in this instance, TD refused to refund the fees even in the face of overwhelming evidence that they were not justified.

368.    TD Bank later loaned over a million dollars in funding to CAPC while Plaintiff and his client PCH had a lis pendens filed against PCH's property following its unlawful foreclosure and sheriff's sale to CAPC.

369.    It is directly alleged that TD Bank's theft of Plaintiff's funds as described above is the direct cause of Plaintiff's default with Discover and other consumer credit lenders.

370.    Sometime thereafter, Defendant Discover Bank unlawfully charged off one of Plaintiff's accounts after Discover's employees represented that was not in danger of happening if Plaintiff made an additional payment.

371.    Plaintiff was in fact still within his contractual right to avoid a charge off by making an additional payment.

372.    Discover charged off the account anyway and the matter was referred to collections.

373.    Discover is not alleged to be a part of the racketeering conspiracy plead herein but is nonetheless responsible herein for negligent supervision of its employees leading to a small portion of Plaintiff's damages.

374.    The collections account was eventually assigned to Passaic County debt collections firm Pressler&Verniero, PC, who are notorious for ignoring litigant's rights and have been sanctioned numerous times for violating court rules.

375.    Pressler never served Plaintiff with a complaint and made false representations to Bergen County Superior Court to obtain a default judgment against Plaintiff without notice to Plaintiff.

376.    Pressler then unlawfully used the judgment to seize Plaintiff's new bank account with Columbia Bank, N.A. in Fair Lawn, NJ.

377.    At the time, Plaintiff's bank account had approximately $300.00 in it; it is against New Jersey state law to garnish or sieze a bank account with less than $1,000.00.

378.    Columbia Bank has loaned money and has significant business dealings throughout Paterson.

379.    Plaintiff attempted to vacate the judgment, and presented clear evidence that Pressler had failed to serve Plaintiff.

380.    Defendant Joseph Monaghan, in spite of direct evidence of Pressler's failure to serve the complaint and court rules that require the Clerk of Court to vacate credit judgments without a motion from the aggrieved party, refused to vacate the judgment.

381.    The record of proceedings in that matter clearly demonstrate Monaghan intended to ignore Plaintiff's arguments and deny Plaintiff's motion to vacate.

382.    It is directly alleged that these arbitrary and capricious actions by TD Bank, Columbia Bank, and Judge Monaghan were a concerted effort to get Plaintiff evicted from his apartment at 55 Church Street in Paterson, NJ.

## COUNT ONE:
### Acquisition and Maintenance of an Interest in
### and Control of an Enterprise Engaged in a Pattern of Racketeering Activity:
### 18 U.S.C. §§ 1961(1)(A);  1961(1)(B); 1961 (1)(D),  1962(a through d).

383.    Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form.

384.    At various times and places partially enumerated in Plaintiff's Complaint, all Defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a RICO enterprise of individuals who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C. §§ 1961(1)(A);  1961(1)(B); 1961 (1)(D), 1962(a through d).

385.    During the ten (10) calendar years preceding March 1, 2003 A.D., all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized

in the RICO laws at 18 U.S.C. §§ 1961(1)(A);  1961(1)(B); 1961 (1)(D), and did so in violation of the RICO law at 18 U.S.C. 1962(a through d) (Prohibited activities).

386.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(a through d) supra.

387.    Pursuant to the original Statutes at Large, the RICO laws itemized above are to be liberally construed by this honorable Court.  Said construction rule was never codified in Title 18 of the United States Code, however.  See 84 Stat. 947, Sec. 904, Oct. 15, 1970.

388.    Respondeat superior (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise).

### COUNT TWO:
**Conduct and Participation in a RICO Enterprise
through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)**

389.    Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form.

390.    At various times and places partially enumerated in Plaintiff's documentary material, all Defendants did associate with a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

391.    Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

392.    During the ten (10) calendar years preceding March 1, 2003 A.D., all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized

in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18

U.S.C. 1962(c) (Prohibited activities).

393.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized

above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a

continuing threat of their respective racketeering activities, also in violation of the RICO law at 18

U.S.C. 1962(c) supra.

394.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be

liberally construed by this honorable Court.  Said construction rule was never codified in Title 18 of the

United States Code, however.  Respondeat superior (as explained above).

**COUNT THREE:**
**Conspiracy to Engage in a Pattern of Racketeering Activity:**
**18 U.S.C. §§ 1961(5), 1962(d)**

395.    Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates

same by reference, as if all were set forth fully herein.  Substance prevails over form.

396.    At various times and places partially enumerated in Plaintiff's documentary material, all

Defendants did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern

of racketeering activity, in violation of 18 U.S.C. §§ 1962(b) and (d).

397.    At various times and places partially enumerated in Plaintiff's documentary material, all

Defendants did also conspire to conduct and participate in said RICO enterprise through a pattern of

racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d).  See also 18 U.S.C. §§ 1961(4), (5)

and (9).

398.    During the ten (10) calendar years preceding October, 2022, all Defendants did cooperate

jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18

U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

399.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. 1962(d) (Prohibited activities supra).

400.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be liberally construed by this honorable Court.  Said construction rule was never codified in Title 18 of the United States Code, however.  Respondeat superior (as explained above).

**COUNT FOUR**
**VIOLATIONS OF 18 U.S. Code § 241 AND 42 U.S.C. § 1983.**
**POLICE INTIMIDATION THROUGH VIOLENCE AND THREATS**

401.    The Defendants, acting under color of state law deprived the plaintiff of his legitimate rights and personal freedom through the following violations of 18 U.S. Code §241.

402.    Defendants wilfuly and knowingly attempted to entrap Plaintiff by unlawfully seizing his personal property as described in the preceding paragraphs.

403.    Defendants willfully and knowingly executed an unlawful arrest of Plaintiff as described in the preceding paragraphs for the purpose of intimidation and suppression of his rights as a citizen and resident of the City of Paterson, NJ.

404.    Defendants directly interfered with Plaintiff's Rights to Lawfully Own Firearms under the Second Amendment of the Constitution of the United States.

405.    Defendants willfully, knowingly and unlawfully attempted to force Plaintiff to waive his rights as a criminal defendant and his right recover possession of his lawfully owned property.

406.    Defendants willfully and knowingly filed premature and baseless motions and scheduled hearing dates to create scheduling conflicts and to otherwise frustrate Plaintiff's rights as a criminal defendant and a civil litigant.

**Prayer For Relief From**
**18 USC 241,  42 U.S.C. § 1983 Violations**

WHEREFORE, Plaintiff demands judgment for physical and mental damage, as well as false arrest, false imprisonment, and malicious prosecution in the amount of $2,500,000.00 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount of $1,500,000.00, plus the costs of this action, including attorney's fees should the plaintiff obtain an attorney, and such other relief deemed to be just and equitable.

<u>COUNT FIVE</u>
**ABUSE OF PROCESS AND MALICIOUS PROSECUTION**
**42 U.S.C. § 1983**

407.    Defendants, acting under color of state law, willfully and knowingly abused their power and process in a direct attempt to damage Plaintiff and his clients.

408.    Defendants willfully and knowingly attempted to falsify the record in Plaintiff's Criminal and Civil matters through various means.

409.    Defendants willfully and knowingly attempted to deprive Plaintiff of probable cause hearings that are mandatory under the New Jersey Rules of Court and relevant statutes.

410.    Defendants willfully and knowingly attempted to deprive Plaintiff of pre-indictment and preliminary hearings.

411.    Defendants willfully and knowingly deprived Plaintiff of a speedy trial for the purpose of interfering with his professional practice and his civil liberties.

412.    Defendants willfully and knowingly deprived Plaintiff discovery.

413.    Defendants willfully and knowingly destroyed exculpatory evidence for the purpose of continuing their false and fraudulent prosecution and harassment.

414.    Defendants willfully and knowingly prevented any record of chain of custody to the destroyed evidence and actively prevented Plaintiff from obtaining the same.

415.    Defendants refused to hold hearings in the face of clear, concise, and direct allegations of misconduct among themselves and their subordinates.

416.    Defendants actively used their influence and the abused the power of their offices to prevent investigation into said misconduct.

417.    Even in the event that Defendants were unaware of the illegality, Defendants failed to take appropriate action in response to Plaintiff's clear, concise and direct demands for hearings.

418.    Defendants willfully and knowingly attempted to deprive Plaintiff of his right to due process.

419.    Defendants willfully and knowingly attempted to conceal their egregious violations of due process through falsification of court records and fraud upon the Courts of New Jersey.

420.    Defendants knowingly and willfully issued arrest warrants without having filed charges in an attempt to frustrate Plaintiff's freedom of movement and to force Plaintiff to relocate from the State of New Jersey under the threat of unlawful arrest, serious bodily harm and death.

**Unlawful Interference with Plaintiff's Law Practice**

421.    Defendants willfully and knowingly engaged in the conduct in the preceding paragraphs as part of a criminal conspiracy to undermine Plaintiff's law practice.

422.    Defendants willfully and knowingly attempted to delay hearings or otherwise arrange scheduling in direct conflict with Plaintiff's obligations to other parties as an attorney.

423.    Defendants willfully and knowingly refused reasonable accommodations with an eye towards undermining Plaintiff's fiscal ability to operate his practice.

424.    Defendants willfully and knowingly refused reasonable accommodations with an eye towards issuing false and facetious holdings without legal basis and for the purpose of furthering their co-Defendants business and political interests.

425.    Defendants willfully and knowingly denied Plaintiff his right to earn a living.

426.    Defendant willfully and knowingly interfered with Plaintiff's right to advocate for his clients.

**Request For Relief**
**from U.S.C. § 1983 Violations**

WHEREFORE, Plaintiff demands judgment for abuse of process and malicious prosecution, interference with Plaintiff's law practice and ability to serve his clients, against all the Defendants jointly and severally, for actual, general, special, compensatory damages in the amount of $1,500,000.00, and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount of $4,500,000.00, plus the costs of this action, including attorney's fees should the plaintiff obtain an attorney, and such other relief deemed to be just and equitable.

**COUNT SIX**
**RETALIATION FOR PROTECTED ADVOCACY**
**42 U.S.C. §1981 AND  42 U.S.C. § 1983**

427.    Defendants willfully and knowingly targeted Plaintiff through the conduct detailed in the preceding paragraphs in retaliation for Plaintiff's advocacy as an attorney and as a private citizen.

428.    Defendants targeted Plaintiff due to Plaintiff's attempts to ensure lawful, transparent and ethical historic preservation programs.

429.    Defendants targeted Plaintiff due to Plaintiff's attempts to ensure lawful, transparent and ethical housing  programs.

430.    Defendants targeted Plaintiff due to Plaintiff's attempts to ensure lawful, transparent and ethical small business policies.

431.    Defendants targeted Plaintiff due to Plaintiff's attempts to ensure lawful, transparent and ethical administration of the Paterson, New Jersey municipal government.

432.     Defendants targeted Plaintiff due to Plaintiff for the purpose of furthering unlawful criminal enterprises of their own or those of third parties.

433.    Defendants targeted Plaintiff in furtherance of an unlawful scheme to control state and federal funding for the programs referenced in the preceding paragraphs.

434.    Defendants targeted Plaintiff in a failed bid to silence his advocacy and to prevent investigation into their unlawful conduct.

435.    Defendants serve in numerous roles that, in combination, control and manage the day-to-day functions of the City of Paterson, the County of Passaic, and the State of New Jersey, including but not limited to the Passaic County Superior and Municipal Courts.

436.    The conduct complained of was committed by Defendants acting under color of state law.

437.    Defendants, in abuse of their offices as high ranking politicians, prosecutors, judges, and courthouse administrators,  deliberately engaged in unlawful conduct in order to give the appearance of legitimacy to the unlawful actions of their co-Defendants.

438.    Defendants falsified tax, property and court records to cover up the unlawful theft of real property and government funds from New Jersey State taxpayers.

439.    Defendants also filed and prosecuted false ethics complaints against Plaintiff for the purpose of undermining Plaintiff's reputation through various local newspapers and professional publications serving the legal community that would discourage other state officials and legal professionals from relying on Plaintiff's accusations and testimony.

440.    The misconduct of Defendants directly resulted in severe harm to Plaintiff's professional reputation and as such made it easier for Defendants to hide their illegal actions.

441.    The misconduct against Plaintiff has him on the verge of losing his license to practice law through meritless, false and unlawfully filed ethics complaints filed by Defendants with the goal of creating a false narrative that Plaintiff is unethical.

442.     Plaintiff has been denied his due process rights in order to prevent Plaintiff from exercising his rights as an American Citizen.

### Request For Relief From 42 U.S.C. §1981 AND  42 U.S.C. § 1983 Violations

WHEREFORE, Plaintiff demands judgment for Defendants' concerted and unlawful attempts to deprive Plaintiff of his right to use his professional degrees and certifications in the practice of law; to deprive Plaintiff of his rights under the First Amendment of the United States Constiution; Defendants' deprivation of Plaintiff's rights in furtherance of his duties as an Officer of the Courts of the State of New Jersey,  the Abuse of Process in using the legal system as a weapon for destroying Plantiff's practice and public advocacy, and retaliation for 42 U.S.C. § 1981 Protected Advocacy against all the Defendants jointly and severally, for actual, general, special, compensatory damages in the amount of $500,000.00 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount of $1,500,000.00, plus the costs of this action, including attorney's fees should the plaintiff obtain an attorney, and such other relief deemed to be just and equitable.

### COUNT SEVEN
### VIOLATIONS of 42 U.S.C. § 1985(3)
### CIVIL RIGHTS CONSPIRACY

443.     Defendant has been harmed as a result by an ongoing civil rights conspiracy targeting residents and tax payers of the City of Paterson and the County of Passaic in the State of New Jersey.

444.     Defendants' conspiracy is a knowing, willful and deliberate attempt to control taxpayer and state and federal grant funding for the furtherance of their own business and political interests.

445.     Defendants are knowingly and willfully abusing their offices, positions and titles to undermine the will of the voting public and unlawfully control state and local government outside of the confines of Federal and New Jersey law.

446.    Defendants use the funding referenced in the preceding paragraph in unlawful patronage schemes designed to unlawfully control boards and commissions in violation of state and federal law.

447.    Defendants use the funding referenced in the preceding paragraphs to unlawfully, willingly and knowingly circumvent state and federal prohibitions on pay-to-play activity.

448.    Defendants have used their power, influence and titles to deprive minority residents in minority dominant communities of positions on boards and commissions that, as an effect of said misconduct, are dominated by white, nonresident commissioners and trustees.

449.    Defendants conduct has deprived minority and low income individuals of housing benefits, grant benefits and equal opportunity.

450.    Defendants actively and knowingly control bidding processes, grant processes, and municipal budgets for the purposes of diverting funds towards illicit schemes.

451.    Defendants have done so in retaliation for Plaintiff insisting on transparency in city and county government in compliance with New Jersey State law.

452.    Defendants have committed these offenses in retaliation for Plaintiff's defense of historic properties and historic preservation resources that Defendants were unlawfully funneling to their supporters.

453.    Defendants have committed these offenses in retaliation for Plaintiff having opposed their unlawful actions in defense of tenant's and taxpayer's rights.

454.    While committing these offenses, Defendants have attempted to hide behind their offices and positions of power to grant their unlawful actions a presumption of legality with full knowledge that their conduct was in fact retaliatory and unlawful.

455.    Defendants have attempted to abuse procedural rules by refusing to provide legally sufficient justification for their actions, often ignoring the need to conduct hearings to avoid a public record of their being on direct notice of the illegality of their actions.

456.    The above conduct by Defendants are extrinsic frauds to obstruct justice and commit fraud on the New Jersey state courts on the specific times and dates shown on the appearance dockets for the subject actions.

457.    the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States.

458.     The Plaintiff is a citizen of the United States of America, and is entitled to due process under the Constitution of the United States and the Constitution of the State of New Jersey.

459.    Plaintiff was deprived of criminal and civil due process rights in all cases in which Plaintiff was falsely labeled a Defendant/Respondent in actions before New Jersey Municipal Courts, Superior Courts, and the Office of Attorney Ethics.

**Request For Relief From**
**42 U.S.C. § 1985(3) Violations**

460.    WHEREFORE, Plaintiff demands judgment for the damages resulting from the defendants' Civil Rights conspiracy against all the Defendants jointly and severally, for actual, general, special, compensatory damages in the amount of $750,000.00 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount of $2,250,000.00, plus the costs of this action, including attorney's fees should the plaintiff obtain an attorney, and such other relief deemed to be just and equitable

**Demand for Relief**

The plaintiff respectfully seeks damages in the amount of FIFTEEN MILLION DOLLARS ($15,000,000.00), treble damages, the costs of this action, including attorney's fees should the plaintiff obtain an attorney, and such other relief deemed to be just and equitable.

David R. Cubby, Esq.

Plaintiff appearing *Pro se*

May 12, 2023

## __VERIFICATION__

I, David R. Cubby, declare as follows:

1.      I have personal knowledge of myself and my activities, including those set out in the foregoing

Complaint, and if called upon to testify I would competently testify as to the matters stated herein.

2.      I verify under penalty of perjury under the laws of the United States of America that the factual

statements in this Complaint concerning myself and my activities are true and correct.

Date: May 12, 2023
Plaintiff Appearing Pro Se